## AHRENS *v.* HASKIN.

5-1130                                          299 S. W. 2d 87

Opinion delivered February 25, 1957.

*Thomas B. Tinnon,* for appellant.

*Emery D. Curlee,* Chicago, Ill., for appellee.

CARLETON HARRIS, Chief Justice. Appellee, A. C. Haskin, is a real estate broker at Mountain Home, Arkansas, and appellant,[1] Richard Ahrens, owned and operated an ice manufacturing plant and cold storage lock-

---

[1] Peoples Bank of Mountain Home is only a nominal party as it is holding a sufficient amount of money belonging to Ahrens to satisfy any judgment obtained by appellee.

er plant in said location. Appellant entered into an oral non-exclusive listing agreement with appellee, whereby appellee was to sell the property and receive a commission of five per cent. Appellant directed appellee to ask the price of $27,500.00. Appellee made contact with one Joe Watson, and showed Watson the property on May 20th, 1954. Watson was interested, but did not wish to negotiate further until his uncle (a Mr. Esker Watts, who lived out of the state, and who had been engaged in the cold storage locker business for some years) had a chance to look at the property. Some six weeks later, appellee showed the ice and locker plant to the uncle, who recommended against his nephew's purchasing same at the $27,500.00 price. Watson returned to his home in West Virginia, but in January, 1955, came back to Mountain Home, where further conversations were held with appellee. The evidence shows that Watson advised appellee that he would pay "in the neighborhood" of $20,000 for the property. Appellee inquired of appellant as to whether he would be willing to take a reduced price, and appellant replied that his wife would not sign for any lesser amount. In the meantime, appellant had learned that Watson was back in the county, and had made a visit to Watson's home, but had been unable to locate him. Early in February, appellant went directly to Watson and began negotiations. On the same day, and prior to contacting Watson, appellant had a conversation with appellee in which he suggested that the two of them go to see Watson and determine if he would pay the $27,500. Appellee replied that there was no use to see him "at that figure." Appellant declined to reduce the price, and went on to personally contact Watson himself. The sale was consummated in early April at a price of $21,000. Appellee instituted suit for the five per cent of the sale price, and the Court awarded him such amount, ($1,050). From said decree of the Court comes this appeal.

There is not a great deal of conflict in the evidence, but one main difference relates to the terms of the agreement. Appellant stated that the five per cent commission was only to be paid if appellee succeeded in sell-

ing the property for $27,500, while appellee testified that he was to receive the five per cent irrespective of the purchase price. The only direct evidence on this point was the testimony of the two principals, which, as stated, was in direct conflict; however, Joe Watson, the purchaser of the property, testified that he inquired of appellant as to whether he intended paying appellee any commission, and was told by appellant that he "would take care of him." The matter was purely a question of fact for the Court to determine, and we have heretofore held that a Chancellor's findings will not be disturbed unless clearly against the weight of the evidence. *Lupton* v. *Lupton,* 210 Ark. 140, 194 S. W. 2d 686 (1946).

Appellant argues that the original negotiations were unproductive of a sale, and such were abandoned in June, 1954. He then contends that the resumption of the negotiations seven months later was directly between appellant and Watson; that these latter negotiations were the sole cause of the sale, and appellee had nothing to do with it. We cannot agree with this contention. It is true that negotiations between appellee and Watson were temporarily broken off when Watson returned to West Virginia in June, 1954. It is, however, undisputed that upon his return to Mountain Home, he talked with appellee on several occasions relative to the property, and it is undisputed that appellee endeavored to obtain the permission of appellant to offer the property at a lower price. It is also undisputed that appellant, on the same day that he went to see Watson and began to negotiate on his own, first tried to get appellee to go with him to see if the prospective purchaser could not be talked into giving the full amount that had been asked. We conclude from the evidence that appellee still had his authority to promote a sale, and that the negotiations carried on by him with Watson, after the latter's return in January, were under full authority from appellant.

In order for Haskin to recover his commission, it must first be found that his efforts were the procuring

cause of the sale. Hartzog v. Dean, 216 Ark. 17, 223 S. W. 2d 820. It is undisputed that Watson was first contacted by appellee in regard to the sale of the property. Appellee took him to the plant where the premises might be viewed. Later, appellee took Watson's uncle through the plant. He had several conversations with Watson after the latter's return, and tried to prevail upon appellant to reduce the price in order to further the sale. Certainly, he endeavored to maintain the prospective purchaser's interest in the property. There is no indication that Watson would have even known that the property was being offered for sale had not appellee, under his agreement with appellant, contacted him with reference thereto. Likewise, there is no indication that appellant would have known of Watson's interest except upon advice of appellee. Under the evidence, it is apparent that appellee would have pursued the sale to its conclusion had appellant authorized him to offer the property for the price that was finally received. The fact that the property was sold on modified terms is immaterial. Hartzog v. Dean, supra. We consider that Haskin was the procuring cause of the sale, and so find. On the whole case, we are of the opinion that the Chancellor's findings are supported by the evidence. The cause is accordingly affirmed.